# UNITED STATES DISTRICT COURT

### for the

### Central District of California

| | |
|---|---|
| In the Matter of the Search of:<br>Information associated with account identified as<br>Snapchat Account User ID **be269b0f-0f37-4f70-**<br>**95db-3e743946d9df** that is within the possession,<br>custody, or control of Snap Inc. | )<br>)<br>)<br>)<br>)<br>)     Case No. 2:23-MJ-4255 |

## APPLICATION FOR WARRANT BY TELEPHONE PURSUANT TO 18 U.S.C. § 2703

I, a federal law enforcement officer, request a warrant pursuant to Title 18, United States Code, Section 2703, and state under penalty of perjury that I have reason to believe that within the following data:

*See Attachment A-2*

There are now concealed or contained the items described below:

*See Attachment B-2*

The basis for the search is:

☒ Evidence of a crime;
☒ Contraband, fruits of crime, or other items illegally possessed;
☐ Property designed for use, intended for use, or used in committing a crime.

The search is related to a violation of:

| *Code section(s)* | *Offense Description* |
|---|---|
| 18 U.S.C § 2243(b) | Sexual Abuse of a Ward |

The application is based on these facts:

*See attached Affidavit, which is incorporated herein by reference.*

*/s/ Andrew R. Howard (telephonically submitted)*
*Applicant's signature*

Andrew R. Howard, Special Agent (DOJ OIG)
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

City and State: _____

_____
*Judge's signature*

Alka Sagar, U.S. Magistrate Judge
*Printed name and title*

AUSA: Brian Faerstein (x3819)

**ATTACHMENT A-2**

**PROPERTY TO BE SEARCHED**

This warrant applies to information associated with "SUBJECT ACCOUNT 2" identified as Snapchat Account User ID **be269b0f-0f37-4f70-95db-3e743946d9df,** believed to be associated at times with usernames "adams25u" and "papipapi_loco," that is within the possession, custody, or control of Snap Inc. (the "PROVIDER"), a company that accepts service of legal process at 2772 Donald Douglas Loop North, Santa Monica, CA 90405, regardless of where such information is stored, held, or maintained.

**ATTACHMENT B-2**

**ITEMS TO BE SEIZED**

I.   **SEARCH PROCEDURES**

1.   The warrant will be presented to personnel of Snap Inc. (the "PROVIDER"), who will be directed to isolate the information described in Section II below.

2.   To minimize any disruption of service to third parties, the PROVIDER's employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the information described in Section II below.

3.   The PROVIDER's employees will provide in electronic form the exact duplicate of the information described in Section II below to the law enforcement personnel specified below in Section IV.

4.   With respect to contents of wire and electronic communications produced by the PROVIDER (hereafter, "content records," see Section II.10.a. below), law enforcement agents and/or individuals assisting law enforcement and acting at their direction (the "search team") will examine such content records pursuant to search procedures specifically designed to identify items to be seized under this warrant.  The search shall extract and seize only the specific items to be seized under this warrant (see Section III below).  The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.  The review of the electronic data may

be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

6.   The search team will complete its search of the content records as soon as is practicable but not to exceed 120 days from the date of receipt from the PROVIDER of the response to this warrant.  The government will not search the content records beyond this 120-day period without first obtaining an extension of time order from the Court.

7.   Once the search team has completed its review of the content records and created copies of the items seized pursuant to the warrant, the original production from the PROVIDER will be sealed -- and preserved by the search team for authenticity and chain of custody purposes -- until further order of the Court.  Thereafter, the search team will not access the data from the sealed original production which fell outside the scope of the items to be seized absent further order of the Court.

8.    The special procedures relating to digital data found in this warrant govern only the search of digital data pursuant to the authority conferred by this warrant and do not apply to any search of digital data pursuant to any other court order.

9.    Pursuant to 18 U.S.C. § 2703(g) the presence of an agent is not required for service or execution of this warrant.

## II.   <u>INFORMATION TO BE DISCLOSED BY THE PROVIDER</u>

10.   To the extent that the information described in Attachment A-2 is within the possession, custody, or control of the PROVIDER, regardless of whether such information is located within or outside of the United States, including any information that has been deleted but is still available to the PROVIDER, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose the following information to the government for the SUBJECT ACCOUNT listed in Attachment A-2:

a.    All contents of all wire and electronic communications associated with the SUBJECT ACCOUNT, limited to that which occurred between March 1, 2019, and the date of this warrant,[1] including:

i.    All e-mails, communications, or messages of any kind associated with the SUBJECT ACCOUNT, including stored or preserved copies of messages sent to and from the account,

---

[1] To the extent it is not reasonably feasible for the PROVIDER to restrict any categories of records based on this date restriction (for example, because a date filter is not available for such data), the PROVIDER shall disclose those records in its possession at the time the warrant is served upon it.

deleted messages, and messages maintained in trash or any other folders or tags or labels, as well as all header information associated with each e-mail or message, and any related documents or attachments;

   ii. All records or other information stored by subscriber(s) of the SUBJECT ACCOUNT, including address books, contact and buddy lists, calendar data, pictures, videos, notes, texts, links, user profiles, account settings, access logs, and files;

   iii. All records pertaining to communications between the PROVIDER and any person regarding the SUBJECT ACCOUNT, including contacts with support services and records of actions taken;

   iv. All photos and videos uploaded from the SUBJECT ACCOUNT, all photos and videos uploaded by any user that have that user tagged in them, and all photos and videos commented on by the user, as well as any metadata associated therewith, including any EXIF data;

   v. All of the following information created and/or shared by, and associated with, the SUBJECT ACCOUNT: profile information; Snaps, Snapbacks, Stories, and Memories; Location Data; status updates; videos, photographs, various images (including "avatars"), and other items shared and received; records of videos, photographs, various images, and other items shared by the SUBJECT ACCOUNT and saved by other users; friend lists, including persons identified as "My Friends," and including the friends' Snapchat user names and

display names (including those of any deleted or removed
friends); groups and networks of which the user is a member,
including any identification numbers; items purchased;
notifications and notification settings of any kind; and
information about the user's access and use of Snapchat or
third-party applications or "apps" and content shared with other
Snapchat users;

vi.   All other records of communications and
messages of any kind made or received by the user of the SUBJECT
ACCOUNT, including all private or instant messages or "Chats,"
and specifically including all attachments to any messages in
their native formats (for example, if a .zip file was sent to
another user, the .zip file shall be provided), history of
communications of any kind, and video calling history;

vii. All "Active Sessions" information and
activity logs for the account and all other documents showing
the user's posts and other Snapchat activities;

viii.    All search history and web history for
the user of the SUBJECT ACCOUNT, including records of Snapchat
searches and internet/web searches, and including web browsing
that might occur outside of Snapchat, but that Snapchat is able
to connect to the SUBJECT ACCOUNT when the SUBJECT ACCOUNT
visits websites that are using Snapchat's webpage "like"
functionality;

ix.  All information regarding clicks of, or
responses to, advertisements;

x.    Any credit card numbers provided by the user for purchases on Snapchat;

xi.   All stored passwords, including passwords stored in clear text and hash form, and for any hashed values that include a salt, the PROVIDER shall provide the salt value used to compute the stored password hash value, and any security questions and answers;

xii. All search history and web history by the user of the SUBJECT ACCOUNT; and

xiii.    All web browsing activities that are identifiable with the SUBJECT ACCOUNT.

b.   All other records and information, including:

i.    All subscriber information, including the date on which the account was created, the length of service, the IP address used to register the account, the subscriber's full name(s), user name(s), display name(s), any alternate names, other account names or e-mail addresses associated with the account, linked accounts, telephone numbers, physical addresses, and other identifying information regarding the subscriber, including any removed or changed names, e-mail addresses, telephone numbers or physical addresses, the types of service utilized, account status, account settings, login IP addresses associated with session dates and times, as well as means and source of payment, including detailed billing records, **and including any changes made to any subscriber information** or services, including specifically changes made to secondary e-mail accounts, phone numbers, passwords, identity or address

information, or types of services used, and including the dates on which such changes occurred, for the following accounts: the SUBJECT ACCOUNT listed in Attachment A-2.

   ii. All user connection logs and transactional information of all activity relating to the SUBJECT ACCOUNT described above in Section II.10.a., including all log files, dates, times, durations, data transfer volumes, methods of connection, IP addresses, ports, routing information, dial-ups, and locations, and including specifically the specific product name or service to which the connection was made.

   iii.All "check ins," "last location," and other Location Data information;

   iv. All past and present lists of friends created or accepted by the account;

   v. All privacy settings and other account settings, including privacy settings for individual Snapchat posts and activities, privacy settings that apply to certain lists of Snapchat friends and the accompanying lists, and all records showing which Snapchat users have been blocked by the account;

   vi. All information about the user's access and use of Snap Store;

   vii.All information about connections between the account and third-party websites and applications;

   viii. All information related to the SUBJECT ACCOUNT's membership in any groups, including the identity of other accounts in the same group, and information identifying

any groups or organizational pages or accounts for which the SUBJECT ACCOUNT is an administrator;

       ix. Any push token or device token identifiers;

       x.  Any facial recognition data;

       xi.  any and all logs of user activity and user agent string, including:  web requests or HTTP requests; any logs containing information such as the Requestor's IP address, identity and user ID, date and timestamp, request URI or URL, HTTP protocol version, referrer, and other user agent string information; login tracker logs; account management logs; and any other information concerning other e-mail or social media accounts accessed by or analytics related to the SUBJECT ACCOUNT;

       xii. Any and all cookies used by any computer or web browser associated with the SUBJECT ACCOUNT, including the IP addresses, dates, and times associated with the recognition of any such cookie;

       xiii.    any other account associated with the cookie(s) associated with the SUBJECT ACCOUNT.

       xiv. any other account associated with the SUBJECT ACCOUNT, including by means of sharing a common secondary, recovery, or alternate **e-mail address listed in subscriber records** for the SUBJECT ACCOUNT or by means of sharing a **common phone number or SMS number listed in subscriber records** for the SUBJECT ACCOUNT, and any account that lists the SUBJECT ACCOUNT as a secondary, recovery, or alternate e-mail address.

xv.   Any information identifying the device or devices used to access the SUBJECT ACCOUNT, including any Android ID, Advertising ID, unique application number, hardware model, operating system version, unique device identifier, Global Unique Identifier or "GUID," serial number, mobile network information, phone number, device serial number, MAC address, Electronic Serial Number ("ESN"), Mobile Electronic Identity Number ("MEIN"), Mobile Equipment Identifier ("MEID"), Mobile Identification Number ("MIN"), Subscriber Identity Module ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifier ("IMSI"), International Mobile Equipment Identity ("IMEI"), or Apple advertiser ID or ID for advertisers ("IDFA") or Google's AAID or any other advertiser ID, and any other information regarding the types of devices used to access the SUBJECT ACCOUNT or other device-specific information, including the device type, brand name, device mode or operating system, and first and last times that a device were observed;

xvi. any other account accessed by a device with an identifier responsive to the device identifiers called for in paragraph 10.b.xiv.

xvii.   Any information showing the location of the user of the SUBJECT ACCOUNT, including while sending or receiving a message using the SUBJECT ACCOUNT or accessing or logged into the SUBJECT ACCOUNT.

III. **INFORMATION TO BE SEIZED BY THE GOVERNMENT**

11.  For the SUBJECT ACCOUNT listed in Attachment A-2, the search team may seize:

a.   All information described above in Section II.10.a. that constitutes evidence, contraband, fruits, or instrumentalities of violations of Title 18 U.S.C § 2243(b): Sexual Abuse of a Ward (the "SUBJECT OFFENSE"), namely:

i.   Information relating to who created, accessed, or used the SUBJECT ACCOUNT, including records and communications about their identities, scope of use, and whereabouts.

ii.  Any and all communications related to discussion of past, current, or future sexual acts, sexual conduct, or sexual innuendo between the user of the SUBJECT ACCOUNT and any other person and/or other individuals within a federal correctional facility.

iii. Any and all communications related to past, current, or future grooming of an inmate or inmates of a federal correctional facility to engage in sexual acts, sexual conduct, or sexual innuendo with personnel of a federal correctional facility.

iv.  Any and all communications related to discussion of past, current, or future provision and/or offering of prohibited items by personnel of a federal correctional facility to an inmate of a federal correctional facility.

v.   Any and all communications related to discussion of past, current, or future engagement in conduct

prohibited by the laws, policies, or rules of a federal
correctional facility by personnel of a federal correctional
facility.

vi.  Any and all communications related to
unauthorized contacts by personnel within a federal correctional
facility with family, friends, or other acquaintances of an
inmate or inmates of a federal correctional facility.

vii. Any and all communications related to
discussion of awareness of, and/or tactics or strategies for
avoiding, repercussions of engaging in sexual activity or sexual
conduct within a federal correctional facility.

viii.   Any and all communications related to
discussion of awareness of, and/or tactics or strategies for
avoiding, repercussions of using a digital device to communicate
within a federal correctional facility.

ix.  Any and all contents related to videos,
photos, and other visual depictions reflecting sexual acts,
sexual conduct, or sexual innuendo by inmates or personnel
within a federal correctional facility.

b.  All records and information described above in
Section II.10.b.

### IV.  <u>PROVIDER PROCEDURES</u>

12.  IT IS ORDERED that the PROVIDER shall deliver the
information set forth in Section II within 10 days of the
service of this warrant.  The PROVIDER shall send such
information to:

Special Agent Andrew R. Howard
U.S. Department of Justice
Office of the Inspector General
330 North Brand Blvd, Suite 1000
Glendale, CA 91203
Andrew.Howard2@usdoj.gov

13. IT IS FURTHER ORDERED that the PROVIDER shall provide the name and contact information for all employees who conduct the search and produce the records responsive to this warrant.

14. IT IS FURTHER ORDERED, pursuant to 18 U.S.C. § 2705(b), that the PROVIDER shall not notify any person, including the subscriber(s) of the SUBJECT ACCOUNT identified in Attachment A-2, of the existence of the warrant, until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date this warrant is signed by the magistrate judge or such later date as may be set by the Court upon application for an extension by the United States. Upon expiration of this order, at least ten business days prior to disclosing the existence of the warrant, the PROVIDER shall notify the agent identified in paragraph 12 above of its intent to so notify.

## AFFIDAVIT

I, Andrew R. Howard, being duly sworn, declare and state as follows:

### I.   PURPOSE OF AFFIDAVIT

1.   I make this affidavit in support of applications for warrants for information associated with the accounts identified as:

a.   Snapchat Account User ID **810550e6-647b-46b3-a9e8-ad16092706be**, believed to be associated at times with username "antonio_nav8735" and to have been used at one time by M.U., described further in Attachment A-1 hereto ("SUBJECT ACCOUNT 1"); and

b.   Snapchat Account User ID **be269b0f-0f37-4f70-95db-3e743946d9df**, believed to be associated at times with usernames "adams25u" and "papipapi_loco" and to have been used at one time by Martin ADAMS, described further in Attachment A-2 hereto ("SUBJECT ACCOUNT 2," and, together with SUBJECT ACCOUNT 1, the "SUBJECT ACCOUNTS"),

that are within the possession, custody, or control of Snap Inc. (the "PROVIDER"), a company that accepts service of legal process at 2772 Donald Douglas Loop North, Santa Monica, CA 90405, regardless of where such information is stored, held, or maintained.[1]

---

[1] Because this Court has jurisdiction over the offense(s) being investigated, it may issue the warrant to compel the PROVIDER pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A). See 18 U.S.C. §§ 2703(a) ("A governmental entity may require the disclosure by a provider . . . pursuant to a warrant issued

*(footnote cont'd on next page)*

2.   This affidavit is made in support of an application for a warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), 2703(c)(1)(A) and 2703(d)[2] to require the PROVIDER to disclose to the government copies of the information (including the content of communications) described in Section II of Attachments B-1 and B-2.  Upon receipt of the information described in Section II of Attachments B-1 and B-2, law enforcement agents and/or individuals assisting law enforcement and acting at their direction will review that information to locate the items described in Section III of Attachments B-1 and B-2. Attachments A-1, A-2, B-1, and B-2 are incorporated herein by

---

using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction") and 2711 ("the term 'court of competent jurisdiction' includes -- (A) any district court of the United States (including a magistrate judge of such a court) or any United States court of appeals that -- (i) has jurisdiction over the offense being investigated; (ii) is in or for a district in which the provider of a wire or electronic communication service is located or in which the wire or electronic communications, records, or other information are stored; or (iii) is acting on a request for foreign assistance pursuant to section 3512 of this title").

[2] The government is seeking non-content records pursuant to 18 U.S.C. § 2703(d).  To obtain the basic subscriber information, which does not contain content, the government needs only a subpoena.  See 18 U.S.C. § 2703(c)(1), (c)(2).  To obtain additional records and other information--but not content--pertaining to subscribers of an electronic communications service or remote computing service, the government must comply with the dictates of section 2703(c)(1)(B), which requires the government to supply specific and articulable facts showing that there are reasonable grounds to believe that the records or other information sought are relevant and material to an ongoing criminal investigation in order to obtain an order pursuant to 18 U.S.C. § 2703(d).  The requested warrant calls for both records containing content (see Attachments B-1 and B-2 paragraph II.10.a) as well as subscriber records and other records and information that do not contain content (see Attachments B-1 and B-2 paragraph II.10.b).

reference.

3.     As described more fully below, I respectfully submit there is probable cause to believe that the information associated with the SUBJECT ACCOUNTS constitutes evidence, contraband, fruits, or instrumentalities of criminal violations of Title 18 U.S.C § 2243(b): Sexual Abuse of a Ward (the "SUBJECT OFFENSE").

## II.  **BACKGROUND OF AFFIANT**

4.     I am a Special Agent with the United States Department of Justice, Office of Inspector General ("DOJ OIG") and have been so employed since July 2017.  Prior to that, I was a Special Agent with Homeland Security Investigations ("HSI") within the United States Department of Homeland Security from August 2010 to July 2017.  In my duties as a Special Agent at DOJ OIG, I investigate crimes which encompass theft, embezzlement, fraud, public corruption, cybercrimes, and sexual assault.  I was tasked with investigating criminal activity in and around the Federal Correctional Institution, Terminal Island, in San Pedro, California in February 2018.  As a Special Agent, I am authorized by law or by Government agency to engage in the prevention, detention, investigation, or prosecution of a violation of federal criminal laws.  I attended the Federal Law Enforcement Training Center in 2010, completing the Criminal Investigator Training Program.  I have a Bachelor's Degree in History.  I have completed over twenty criminal investigations.

5.     Through my training and experience, I have become familiar with the methods by which persons, including both

inmates and staff, communicate within federal correctional institutions operated by the Federal Bureau of Prisons ("BOP"). I am also familiar with digital cellphone forensics and cellphone-based messaging applications, such as Snapchat, and their use by persons to communicate.  I have attended various general fraud, money laundering, white-collar investigative trainings sponsored by the Federal Law Enforcement Training Center and other organizations.  During my time as a Special Agent at both HSI and DOJ OIG, I have participated in and supervised numerous investigative activities, arrests and search warrant executions, interviews, consensually-recorded conversations, trial preparation, bank record analysis, telephone toll record analysis, and subpoena preparation.  As a result of my training and experience, I also am familiar with federal laws, regulations, and policies relating to the Prison Rape Elimination Act, as well as investigative techniques related to the investigation of sexual assault and rape in federal correctional institutions.

6.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, quotations reflect words

to the effect of a particular statement and may not constitute verbatim statements, and all dates and times are approximate.

### III.  <u>BACKGROUND ON PROHIBITIONS AGAINST SEXUAL ABUSE OF A WARD</u>

7.   This investigation concerns alleged violations of Title 18, Unites States Code, Section 2243(b), which states, "Whoever, in the special maritime and territorial jurisdiction of the United States or in a Federal prison, or in any prison, institution, or facility in which persons are held in custody by direction of or pursuant to a contract or agreement with the head of any federal department or agency, knowingly engages in a sexual act with another person who is — (1) in official detention; and (2) under the custodial, supervisory, or disciplinary authority of the person so engaging; or attempts to do so, shall be fined under this title, imprisoned not more than 15 years, or both."  Lack of consent is neither an element of nor a defense to this offense.[3]

8.   The following additional definitions apply with respect to the prohibited conduct under 18 U.S.C. § 2243(b):

a.   The term "prison" means "a correctional, detention, or penal facility."  18 U.S.C. § 2246(1).  As relevant here, the Federal Correctional Institution, Terminal Island constitutes a federal prison.

---

[3] In 2022, section 2243 was amended to include a separate criminal provision for "Sexual abuse of . . . an individual in Federal custody," in violation of 18 U.S.C. § 2243(c).  However, because that provision took effect in 2022, after the relevant time period of the alleged conduct at issue here, the SUBJECT OFFENSE pertains only to 18 U.S.C. § 2243(b), to wit, Sexual abuse of . . . . a ward."

b.   The term "official detention" means, in relevant part, "(A) detention by a Federal officer or employee, or under the direction of a Federal officer or employee, following arrest for an offense; following surrender in lieu of arrest for an offense; following a charge or conviction of an offense, . . . or (B) custody by a Federal officer or employee, or under the direction of a Federal officer or employee, for purposes incident to any detention described in subparagraph (A) of this paragraph, including transportation, medical diagnosis or treatment, court appearance, work, and recreation . . . ." 18 U.S.C. § 2246(5).

c.   The term "sexual act" is defined to include, among other things, "(B) contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus;" or "(C) the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person." 18 U.S.C. § 2246(2).[4]

### IV.   SUMMARY OF PROBABLE CAUSE

9.   This affidavit is submitted in support of warrants to

---

[4] Pursuant to the Prison Rape Elimination Act, 34 U.S.C. § 30301, the Department of Justice has promulgated national standards setting forth additional definitions and guidance with respect to, among other things, prohibitions against sexual abuse of individuals in official detention at a federal prison. See generally 28 C.F.R. Part 115.  Those regulations expressly make clear that sexual abuse of an inmate by a staff member takes place regardless of whether there is consent between the parties.  The criminal statute at issue here, namely, Sexual Abuse of a Ward in violation of 18 U.S.C. § 2243(b) (*i.e.*, the SUBJECT OFFENSE) also does not require the government to prove lack of consent on the part of the victim.

search two Snapchat accounts that I believe were used to communicate about, among other things, a prohibited sexual relationship that former federal Correctional Officer Martin ADAMS ("CO ADAMS") maintained at one time with an inmate victim, referred to herein as "M.U.," at the Federal Correctional Institution, Terminal Island ("FCI-TI") in San Pedro, California.

10.  As described further herein, M.U. has alleged that, while M.U. was in official detention and under the custody of CO ADAMS at FCI-TI, CO ADAMS engaged in a course of escalating unauthorized conduct directed at M.U. that ultimately culminated in CO ADAMS engaging in sexual acts with M.U. within FCI-TI. M.U. initially reported this conduct to Special Investigative Services personnel within FCI-TI and then later to DOJ OIG personnel.  Investigating agents at DOJ OIG also spoke with multiple staff members at FCI-TI with first-hand knowledge about certain of M.U.'s allegations as well as with M.U.'s family members regarding other relevant information.

11.  In addition, as part of its investigation, DOJ OIG forensically examined a contraband cell phone that was recovered from a concealed location within FCI-TI.  M.U. at one time had access to and used the contraband cell phone, including to communicate with CO ADAMS over Snapchat.  As detailed further herein, in those Snapchat communications, M.U. used SUBJECT ACCOUNT 1 and CO ADAMS used SUBJECT ACCOUNT 2 to communicate about, among other things, aspects of the previous sexual acts and conduct in which they engaged, other sexual innuendo, and

repercussions CO ADAMS could face if the nature of his relationship and/or unauthorized communications with M.U. were discovered by law enforcement personnel.

## V.   STATEMENT OF PROBABLE CAUSE

12.   Based on my review of law enforcement reports and evidence gathered, conversations with law enforcement officers and witnesses, and participation in this investigation, I am aware of the following.

### A.   Inmate M.U.'s Allegations Regarding Misconduct by Correctional Officer MARTIN ADAMS

13.   In November 2021, FCI-TI inmate M.U. made a report to staff within the Special Investigative Services ("SIS") office at FCI-TI alleging that, starting in or around April 2019, FCI-TI CO ADAMS engaged in a prohibited sexual relationship with M.U.[5]  DOJ OIG subsequently interviewed M.U. in June 2022 regarding the information he had reported to SIS staff at FCI-TI.  During his interviews with SIS staff and DOJ OIG, M.U. alleged the following, in sum and substance.

14.   Beginning in or around April 2019, CO ADAMS began to execute aggressive pat-down searches of M.U. at FCI-TI during which CO ADAMS touched very close to M.U.'s groin.  M.U. approximated this occurred four to five times near the K-Unit[6] metal detector.  When CO ADAMS worked in B-Unit, whenever M.U.

---

[5] Within the BOP, SIS investigates, among other things, allegations of misconduct by BOP officers and staff.

[6] References to units identified by letters generally refer to different housing units within the FCI-TI complex.

walked by CO ADAMS's station, CO ADAMS called M.U. over and
conducted a pat-down search.

15.  In or around September 2019, M.U. moved to E-Unit and
CO ADAMS became more aggressive towards M.U., conducting
frequent searches of M.U.'s cell and asking M.U. about his
personal acquaintances, background, and sexual orientation.
When M.U. asked CO ADAMS why he focused on M.U., CO ADAMS
responded with words to the effect of, "You're special."
Beginning in or around late September or early October 2019, CO
ADAMS arranged on multiple occasions for M.U. to come to CO
ADAMS's office, often while the other inmates went to
commissary.  On many of these occasions, CO ADAMS provided M.U.
with coffee and sandwiches from sources outside FCI-TI
(including Starbucks and Chik-fil-A), which I know from my
training and experience was against BOP policy.  As CO ADAMS
increasingly provided M.U. with this special and unauthorized
treatment, CO ADAMS increasingly began touching M.U.'s arms and
kissing M.U. on his cheeks and lips.  During these encounters,
CO ADAMS frequently asked M.U. about M.U.'s family members by
name, which M.U. found concerning because the family members
referenced were not part of M.U.'s BOP records.  M.U. was
concerned that CO ADAMS had unauthorized access to M.U.'s inmate
central file and could influence M.U.'s life outside of the
institution.

16.  Between in or around September and November 2019,
while M.U. was housed in E-Unit and worked as an orderly in the
Residential Drug Assistance Program (RDAP) Psychology Services

in A-Unit, CO ADAMS frequently contacted M.U.'s work supervisor in Psychology Services and requested that M.U. return to E-Unit to do some work.  When M.U. expressed concerns about being called out of his orderly job, CO ADAMS told him not to "worry about it," or words to that effect.  CO ADAMS further told M.U. that it was not in M.U.'s best interest to stop meeting with CO ADAMS, which M.U. took as a threat.  When M.U. would come to CO ADAMS's office, CO ADAMS shared coffee and sandwiches with him, kissed M.U., and fondled M.U. by touching his legs and penis outside of M.U.'s clothes.  These meetings became a daily occurrence by in or around late November 2019.

17.  In or around late November 2019, CO ADAMS instructed M.U. to wait for CO ADAMS in the back stairwell of E-Unit after the evening head count.  While waiting, M.U. was seen by another correctional officer (referred to herein as "CO-1") conducting rounds.  CO-1 inquired why M.U. was in the stairwell, and M.U. told CO-1 that M.U. could not sleep.  After CO-1 continued his rounds, CO ADAMS brought M.U. to an area by the medical offices and proceeded to sexually stimulate M.U.'s penis with CO ADAMS's hand.  Afterwards, CO ADAMS distracted CO-1, who was still in the general area, to allow M.U. to return to his cell.

18.  During these encounters, CO ADAMS told M.U. that if they got caught, they should both have the same story.  CO ADAMS instructed M.U. to tell others that he was giving CO ADAMS information about other inmates in the facility.

19.  In or around mid-December 2019, CO ADAMS brought M.U. to his office where he gave M.U. a Chick-Fil-A sandwich and CO

ADAMS and M.U. performed oral sex on each other, which
constituted sexual acts under 18 U.S.C. §§ 2243(b) and
2246(2)(B).  CO ADAMS and M.U. engaged in oral sex on other
occasions in December 2019 as well.  On one such occasion, on or
about December 19, 2019 sometime after about 12:00 A.M., another
correctional officer (referred to herein as "CO-2") entered an
office to use the bathroom and saw M.U. standing in front of
ADAMS's desk, leaning forward with his thighs against the desk.
M.U. said CO ADAMS was sitting on the other side of the desk
across from M.U.  M.U. said he and CO ADAMS were not engaged in
oral sex at the exact moment that CO-2 entered the office area,
but M.U. was not supposed to be inside that office space.  The
next day, M.U. was transferred to the Special Housing Unit
("SHU") and interviewed by SIS.  During that interview (which
was separate from M.U.'s later interview with SIS in or around
November 2021 when M.U. first reported CO ADAMS's alleged
actions to SIS), M.U. told SIS that he was giving information
about inmates to CO ADAMS, and M.U. later said he made up this
story to SIS because he was afraid of CO ADAMS.  Sometime in or
around January 2020, CO ADAMS admonished M.U. to stay quiet
about the situation, which M.U. also perceived as a threat.

20.  After M.U. was released from the SHU in February 2020,
CO ADAMS visited M.U. in his cell in J-Unit and touched M.U.
over his clothes.  CO ADAMS also passed notes to M.U. via
different inmates asking M.U. to see CO ADAMS in G-Unit.  The
notes often expressed it was "in [M.U.'s] best interest," or
words to that effect, to see CO ADAMS, which M.U. perceived as

11

threats.  CO ADAMS visited M.U. in his cell on two different occasions in or around June and July 2020 and touched M.U.'s penis over his clothes.

21.  In late 2020, M.U. had a phone conversation with his teenaged son in which his son expressed his desire for a PlayStation.  Shortly thereafter, CO ADAMS pulled M.U. into his office, kissed him, and told him words to the effect of, "Don't worry about your son's PlayStation, I sent it to him.  Now you owe me a lot!"  After this, M.U. confirmed with his son that a man claiming to be M.U.'s friend called M.U.'s son and verified the son's address.  M.U. learned that his son received a PlayStation shortly after this phone call.  M.U. said he was very scared that CO ADAMS was able to contact his son.

22.  In or around January 2021, CO ADAMS asked M.U. if they could communicate outside of work.  M.U. understood that CO ADAMS wanted him to acquire a contraband cellular phone. Between at least in or around March and May 2021, M.U. communicated with CO ADAMS using a contraband cellular phone (as described further below).  M.U. communicated with CO ADAMS at CO ADAMS's direction using Snapchat.  CO ADAMS purchased two pairs of Calvin Klein briefs for M.U., which CO ADAMS asked M.U. to send pictures wearing the briefs to CO ADAMS via Snapchat. M.U.'s cellular phone was confiscated in May 2021 and M.U. was placed back in the SHU in May 2021.  While in the SHU, CO ADAMS instructed M.U. to tell anyone who asked about the phone or the Snapchat account that M.U. found CO ADAMS on Snapchat and

"catfished" CO ADAMS (*i.e.* that M.U. pretended to be another person online).

### B.  Interviews of FCI-TI Personnel Regarding Inmate M.U.'s Allegations of Misconduct by CO ADAMS

23.  As part of its ongoing investigation, DOJ OIG interviewed several officers and staff members whom M.U. alleged may have information regarding interactions between M.U. and CO ADAMS or other aspects of the alleged misconduct by CO ADAMS.  I summarize salient information obtained from several of those interviews below.

24.  DOJ OIG interviewed CO-2 regarding, in part, M.U.'s allegation that in December 2019 CO-2 walked in on CO ADAMS and M.U. while they were in an office together late at night.  CO-2 also prepared a memo and notes regarding his observations regarding this incident.  Based on DOJ OIG's interview and CO-2's earlier memo and notes, CO-2 stated, among other things, that while doing his rounds, CO-2 had to use the restroom in E-Unit.  When he walked into an office area in E-Unit sometime after 12:00 A.M. on December 19, 2019, he noticed M.U. standing in front of the desk in the office, leaning forward on it with his thighs.  CO-2 was aware that a correctional officer was on the other side of the desk based on the fact that CO-2 asked to use the bathroom in the office and heard an affirmative reply from someone on the other side of M.U.  CO-2 stated he thought the situation looked odd, so he returned to the office later and found CO ADAMS in the office but the inmate no longer present. CO ADAMS told CO-2 that M.U. was just asking CO ADAMS a

13

question, and CO-2 reminded CO ADAMS that inmates were not
allowed to enter the office spaces.

25.  DOJ OIG also interviewed CO-1 regarding, in part,
M.U.'s allegation that, on another occasion, CO-1 encountered
M.U. outside of his cell in an area where CO ADAMS had
instructed M.U. to wait for him late at night.  Among other
things, CO-1 informed DOJ OIG that in 2019, prior to his
encounter with M.U., CO-1 recalled that when he was assigned to
E-Unit, CO ADAMS often requested to switch assignments with CO-
1, frequently buying CO-1 Chick-Fil-A sandwiches as a way of
saying thank you.  On the night in question, CO-1 recalled
seeing M.U. out of his cell late at night and CO-1 was confused
as to why M.U. was out.  CO-1 said he told M.U. to return to his
cell in E-Unit.

26.  DOJ OIG also interviewed an employee (referred to
herein as "Employee-1") from RDAP Psychology Services regarding,
in part, M.U.'s allegation that CO ADAMS frequently called for
M.U. to leave his job in Psychology Services so M.U. could meet
up with CO ADAMS, who often would then engage in sexual conduct
with M.U.  Among other things, Employee-1 informed DOJ OIG that
M.U. was sent to the SHU, which Employee-1 believed was because
of something between CO ADAMS and M.U.  When M.U. returned from
the SHU, Employee-1 asked him about the situation, but M.U.
denied that anything happened.  Employee-1 said CO ADAMS came to
Psychology Services several times to visit a doctor in
Psychology Services, but Employee-1 asked the doctor not to
allow CO ADAMS in Psychology Services after M.U.'s return from

the SHU because she wanted to prevent any trouble between CO
ADAMS and M.U.

### C. Interviews of Inmate M.U.'s Mother and Son Regarding M.U.'s Allegation About PlayStation Gift

27. As part of its ongoing investigation, DOJ OIG also
interviewed M.U.'s mother and his son regarding the gift of a
PlayStation that CO ADAMS allegedly bought for M.U.'s son
without solicitation.

28. Among other things, M.U.'s mother informed DOJ OIG
that sometime around Christmas 2020, M.U.'s son received a
PlayStation, which she and M.U.'s son thought was sent by M.U.
M.U.'s mother said M.U. later told her that a correctional
officer called M.U.'s son, but M.U.'s mother denied having any
contact with or knowledge of ADAMS.

29. Among other things, M.U.'s son informed DOJ OIG that
in 2020, he wanted a PlayStation. In February 2021,[7] M.U.'s son
received a phone call from an unknown male who identified
himself as a friend of M.U. M.U.'s son said the unknown male
was a little demanding and asked for M.U.'s son's address, which
M.U.'s son provided. A few days after the call, M.U.'s son
received a parcel containing a PlayStation. DOJ OIG obtained
photographs of the PlayStation from M.U.'s family.

---

[7] M.U.'s mother and M.U.'s son had differing recollections
of the timing of the PlayStation gift.

**D.   Information Obtained from Contraband Cell Phone Used by Inmate M.U. to Communicate with CO ADAMS, Including Over Snapchat**

    1.   <u>Confiscation of Contraband Cell Phone Believed to Be Used by Inmate M.U.</u>

30.   In May 2021, staff at FCI-TI found two cell phones hidden in a wall cavity within a cell that was then assigned to two inmates other than M.U.  Based on my training and experience, I know that cell phones are considered by the BOP to be contraband and inmates are prohibited from possessing or using cell phones while they are incarcerated.[8]

31.   Specifically, during an interview with an inmate regarding an unrelated matter, the inmate told SIS that he had several contraband phones in his cell.  When searching the inmate's cell, BOP staff discovered two cellular phones in a hole in the cell wall.

32.   Based on my knowledge of this investigation, I know that SIS staff questioned inmate M.U. if he had knowledge of the cellular phones found.  Inmate M.U. told SIS staff that he knew the pin code to one of the contraband cell phones and voluntarily provided that pin code to SIS staff, who were able to unlock the phone using that pin code.  M.U. also reported having used that cell phone to communicate with ADAMS using the Snapchat messaging application, adding that he communicated with ADAMS at ADAMS's direction.  The specific cell phone was a red

---

[8] Under Title 18, United States Code, Section 1791(a)(2), it is illegal for an inmate of a prison to possess a prohibited object, including, among other things, "a phone or other device used by a user of commercial mobile service . . . in connection with such service."  18 U.S.C. §§ 1791(a)(2), (d)(1)(F).

Apple iPhone, which was later found to be assigned International
Mobile Equipment Identity number 356450100101028 (the "red
iPhone").

33.  In 2022, BOP provided the red iPhone to DOJ OIG, and a
forensic analyst at DOJ OIG completed a forensic examination of
the device.  Several of the identifiers for the red iPhone do
not necessarily reflect a direct connection to inmate M.U.
Among other things, the Apple ID for the red iPhone is listed as
"itos23749@gmail.com," and several of the applications saved to
the device reflect account names of "Antonio Navarro," "Itos,"
"One Yang," or "Perez Junior."

34.  However, as previously noted, M.U. knew the pin code
to the red iPhone when initially asked to provide it to SIS
staff.  DOJ OIG was able to successfully use that pin code to
unlock the phone when it conducted its own analysis.  M.U. also
told SIS staff at FCI-TI that the red iPhone belonged to another
inmate that allowed M.U. to use it.  In addition, M.U. told DOJ
OIG that he recalled using the username "Antonio Navarro" over
Snapchat and believed CO ADAMS used the username "adams25u" when
they communicated over Snapchat, which information was
corroborated by information obtained from the PROVIDER.

35.  Moreover, according to the DOJ OIG forensic analyst's
review of the red iPhone, the device contained numerous digital
artifacts demonstrating that inmate M.U. had access to and had
been a user of the red iPhone.  For example, as noted further
below, an image of M.U. was discovered in a saved Snapchat
conversation on the red iPhone.  In the image, sent on March 21,

17

2021, M.U. is shirtless, wearing a black wristwatch, white
Calvin Klein briefs, and a white sock.  M.U. is holding the red
iPhone and is taking a self-portrait photo in a mirror.  A
second image found in the same Snapchat conversation, sent May
10, 2021, shows M.U. shirtless, wearing the same black
wristwatch as before, white gym shorts, white socks, and black
tennis shoes.  M.U. is holding the red iPhone and taking a self-
portrait photo in a mirror.

36.  Three additional images of M.U. were found saved
within the red iPhone.  One image showed M.U. in a gray
sweatshirt, laying on a pillow, and looking at the camera; a
second image showed M.U. shirtless with a brown towel over his
shoulder, in what appears to be a shower, and looking at the
camera; and a third image showed M.U. wearing a baseball cap,
gray sweatshirt, and rosary around his neck, and looking at the
camera.  An additional image was found of a shirtless man's
bellybutton, waistline, and the top of a pair of gray athletic
shorts.  The person in the photo has a mole below his
bellybutton, consistent with a mole below M.U.'s bellybutton and
visible in other shirtless images of M.U.

2.  Review of Snapchat Communications Between SUBJECT
ACCOUNTS Believed to Be Used by Inmate M.U. and
CO ADAMS

37.  Based on my knowledge of this investigation and DOJ
OIG's forensic review of the contraband cell phone believed to
be used by inmate M.U., I believe CO ADAMS used an electronic

device to communicate with inmate M.U. over Snapchat, either while CO ADAMS was off-duty or during CO ADAMS's work hours.[9]

38.   Specifically, during the forensic examination of the red iPhone, DOJ OIG found a preserved chain of Snapchat communications, starting on or about March 21, 2021 and running through on or about May 10, 2021, between Snapchat Account User ID 810550e6-647b-46b3-a9e8-ad16092706be (*i.e.*, SUBJECT ACCOUNT 1 believed to have been used by M.U., and described below as "M.U.") and Snapchat Account User ID be269b0f-0f37-4f70-95db-3e743946d9df (*i.e.*, SUBJECT ACCOUNT 2 believed to have been used by CO ADAMS, and described below as "ADAMS").  Based on my training, experience, and knowledge of this investigation, I believe many of the communications between the SUBJECT ACCOUNTS believed to have been used by M.U. and CO ADAMS bear on the improper sexual relationship and the illegal sexual acts (*i.e.*, the act or acts of oral sex in or around late 2019) in which CO ADAMS allegedly engaged with inmate M.U. while M.U. was in official detention at FCI-TI and under the custodial, supervisory, or disciplinary authority of CO ADAMS.

---

[9] Based on my training and experience, I know that BOP employees, such as CO ADAMS, are not permitted to bring cell phones into a BOP facility that houses inmates, such as FCI-TI. Among other things, the BOP's Staff Entrance and Search Procedures, codified at 28 C.F.R. §§ 511.10 *et seq.*, prohibit BOP staff from bringing "prohibited objects" into certain BOP facilities, including but not limited to, "cameras of any type; recording equipment; telephones; [and] electronic devices."  28 C.F.R. § 511.12(b).

39.  For example, on March 21, 2021, from approximately 5:54:14am to 5:54:31am UTC,[10] CO ADAMS and inmate M.U. had the following conversation over Snapchat:

M.U.:     Do you need anything?

ADAMS:    Lol wym?

ADAMS:    I need you in my bed rn

40.  On March 21, 2021, from approximately 6:18:39am to 6:18:54am UTC, CO ADAMS and inmate M.U. had the following conversation over Snapchat:

ADAMS:    Do you really trust him? [in reference to M.U.'s cell mate]

M.U.:     Yeah

ADAMS:    You better not tell a fucking sole about us.

41.  On March 21, 2021, at approximately 7:14:13am UTC, inmate M.U. sent CO ADAMS an apparent "selfie" photograph over Snapchat of M.U. taking a picture in the mirror of M.U. wearing Calvin Klein underwear.  A red Apple iPhone resembling the phone confiscated from FCI-TI that M.U. supplied the pin code in order to unlock can be seen in the photograph.  As previously explained, M.U. has alleged that CO ADAMS provided the Calvin Klein underwear to M.U., which is against BOP policy.[11]  M.U.

---

[10] Based on the DOJ-OIG forensic analyst's review of the device and saved Snapchat communications, I believe the time zone reflected in the Snapchat communications is Universal Time Coordinated, which is eight hours later than Pacific Standard Time and seven hours later than Pacific Daylight Time.

[11] The BOP Program Statement 3420.11, Standards of Employee Conduct, Section 5c, states that "an employee may not offer or give to an inmate or a former inmate or any member of his/her family, or to any person known to be associated with an inmate
*(footnote cont'd on next page)*

provided the Calvin Klein underwear to DOJ OIG as part of its
investigation, and the underwear are maintained in DOJ OIG's
physical evidence file.  I believe from my review of an inmate
photograph in M.U.'s inmate file and meeting him in person that
the person reflected in the selfie photograph is M.U.  After
M.U. sent the selfie photograph over Snapchat, CO ADAMS and
inmate M.U. had the following conversation over Snapchat:

| | |
|---|---|
| M.U.: | Youlike |
| ADAMS: | No I don't. |
| | I love it. |
| M.U.: | Shut up |
| ADAMS: | Lol |
| | Sit on bed and take it |
| M.U.: | Manana |
| ADAMS: | That's the dude I fucked for hours that I said reminded me of you [it is unclear whom this comment is in reference to] |

42.  On March 21, 2021, from approximately 7:23:27am to
7:24:28am UTC, CO ADAMS and inmate M.U. had the following
conversation over Snapchat:

| | |
|---|---|
| ADAMS: | Can you send a pic of just your penis, O no? |
| M.U.: | My bunky is here |
| ADAMS: | Lo se. he might like it |
| M.U.: | I don't know |

or former inmate, any article, favor, or service that is not
authorized in the performance of the employee's duties."

ADADMS:     Lol it's okay. I understand

43.  On March 21, 2021, from approximately 7:36:22am to 7:38:06am UTC, CO ADAMS and inmate M.U. discussed security precautions for M.U. should take when using the cell phone to communicate with ADAMS, and had the following conversation over Snapchat:

    ADAMS:     Okay so yea, if the fbi does get ahold of it and they are able to get inside it , it don't matter Cuz I'm fucked.

                    Haha

    M.U.:      They won't

                    I'll give you up before all that

    ADAMS:     Fuck you! Haha

44.  On March 21, 2021, from approximately 7:39:26am to 7:42:30am UTC, CO ADAMS and inmate M.U. had the following conversation over Snapchat:

    ADAMS:     You're so bad for me. I can't believe I ever let you corrupt me.

    M.U.:      Yea right you corrupt me!

    ADAMS:     Hahaha not even

                    Only reason we're even able to talk is cuz you're involved in some illegal activities

    M.U.:      I know

    ADAMS:     Mmmmhm

    M.U.:      That's the only way

    ADAMS:     I hear ya.

    M.U.:      I always told you I could if I wanted to

```
ADAMS:      This really is crazy tho

            Yeah you did...

            Sometimes I still wonder if this is all a set up

M.U.:       For me ?

ADAMS:      All that time you spend on psychology god only
            knows
```

45.  On May 10, 2021, at approximately 1:42:16am UTC, inmate M.U. sent CO ADAMS another apparent "selfie" photograph over Snapchat of M.U. taking a picture in the mirror of M.U. wearing mesh shorts without a shirt on.  A red Apple iPhone resembling the phone confiscated from FCI-TI for which M.U. supplied the pin code in order to unlock can once again be seen in the photograph.  I believe that the person reflected in the selfie photograph is M.U.  After M.U. sent the selfie photograph over Snapchat, CO ADAMS and inmate M.U. had the following conversation over Snapchat:

```
ADAMS:      [emoji of googly eyes]
            [emoji of face with tongue sticking out and tear
            falling from eye]

M.U.:       What's that

ADAMS:      It's like that's hot

M.U.:       #prison bod

ADAMS:      And looking at it
            Lol is that what you call it?

M.U.:       Yeah

ADAMS:      I like it.
```

46.   On May 10, 2021, from approximately 4:13:11am to
4:14:27am UTC, M.U. discussed the precautions he took with using
the cell phone, and M.U. and CO ADAMS had the following
conversation over Snapchat:

| | |
|---|---|
| M.U.: | It's always on plane mode and of |
| | Off |
| ADAMS: | Smart |
| M.U.: | I try to be |
| | Careful |
| M.U.: | [message with no content] |
| ADAMS: | I'm glad you are |
| | I want you to blow me again! |
| M.U.: | Ok have fun if you fuck someone make a video |
| ADAMS: | Lol okay |

47.   In addition, a photograph of a white male with fair
skin, dark hair, and a light brown goatee was found in the
Snapchat application files on the red iPhone.  The male in the
photograph is wearing a light blue t-shirt and is in a car or
truck wearing a seatbelt.  I believe from my review of a
photograph of CO ADAMS in CO ADAMS's personnel file that the
person reflected in the selfie photograph is CO ADAMS.

**E.   Information Obtained from the PROVIDER Regarding the
SUBJECT ACCOUNTS**

48.   DOJ OIG obtained subscriber information for each of
SUBJECT ACCOUNT 1 and SUBJECT ACCOUNT 2 from the PROVIDER.

49.   With respect to SUBJECT ACCOUNT 1, based on the
records obtained from the PROVIDER, the Snapchat account at one

time had a username of "antonio_nav8735" and a display name of "Antonio Navarro," which, as I previously noted, was a name that inmate M.U. recalled being associated with the Snapchat account that he used on the red iPhone.  In addition, the records obtained from the PROVIDER reflected that SUBJECT ACCOUNT 1 was associated with phone number 909-495-7318, which was the phone number assigned to the red iPhone.

50.  With respect to SUBJECT ACCOUNT 2, based on the records obtained by the PROVIDER, the Snapchat account at one time had a username of "adams25u" which was changed at some point to "papipapi_loco."  As I previously noted, inmate M.U. recalled communicating with a Snapchat account with display name "adams25u" which he understood belonged to CO ADAMS.  In addition, the records obtained from the PROVIDER reflected that SUBJECT ACCOUNT 2 was associated with email address "yab_president@aol.com."  DOJ OIG subsequently obtained subscriber records for this email address from Yahoo Inc., which was the custodian of the email account at this domain.  The subscriber records for "yab_president@aol.com." reflected that the account was associated with the name "Martin Adams."

51.  On July 7, 2023, I sent the PROVIDER a preservation letter requesting that information associated with the SUBJECT ACCOUNTS be preserved for 90 days pursuant to 18 U.S.C. § 2703(f).  As described below, the PROVIDER honors such requests for an initial period of 90 days.

25

**F.   Additional Background Information Regarding Inmate M.U. and CO ADAMS**

52.   As part of DOJ OIG's ongoing investigation, I have reviewed a copy of CO ADAMS's official personnel file.  Based on those materials, I understand that CO ADAMS served as a Correctional Officer at FCI-TI from March 19, 2019, until September 14, 2022.  I understand that CO ADAMS resigned his position with the BOP.

53.   As part of DOJ OIG's ongoing investigation, I also have reviewed the Inmate Profile report and other background information regarding inmate M.U.  Based on those materials, I understand that M.U. was an inmate at FCI-TI from May 2016 to November 2021, at which point he was transferred to the Metropolitan Detention Center Los Angeles.

**G.   Probable Cause to Search the SUBJECT ACCOUNTS**

54.   Based on the foregoing as well as my training and experience on digital devices set forth below, I believe there is probable cause to believe that the SUBJECT ACCOUNTS were used by CO ADAMS and M.U. to communicate and that the SUBJECT ACCOUNTS contain evidence, fruits, and instrumentalities of the SUBJECT OFFENSE.

**VI.   <u>BACKGROUND ON SOCIAL MEDIA AND E-MAIL ACCOUNTS AND THE PROVIDER</u>**

55.   In my training and experience, I have learned that providers of e-mail and/or social media services offer a variety of online services to the public.  Providers, like the PROVIDER, allow subscribers to obtain accounts like the SUBJECT ACCOUNTS.

Subscribers obtain an account by registering with the provider.
During the registration process, providers generally ask their
subscribers to provide certain personal identifying information
when registering for an e-mail or social media account.  Such
information can include the subscriber's full name, physical
address, telephone numbers and other identifiers, alternative e-
mail addresses, and, for paying subscribers, means and source of
payment (including any credit or bank account number).  Some
providers also maintain a record of changes that are made to the
information provided in subscriber records, such as to any other
e-mail addresses or phone numbers supplied in subscriber
records.  In my training and experience, such information may
constitute evidence of the crimes under investigation because
the information can be used to identify the user(s) of an
account.

56.  Therefore, the computers of the PROVIDER are likely to
contain stored electronic communications and information
concerning subscribers and their use of the PROVIDER's services,
such as account access information, e-mail or message
transaction information, and account application information.
In my training and experience, such information may constitute
evidence of the crimes under investigation because the
information can be used to identify the user(s) of the SUBJECT
ACCOUNTS.

57.  A subscriber of the PROVIDER can also store with the
PROVIDER files in addition to e-mails or other messages, such as
address books, contact or buddy lists, calendar data, pictures

or videos (other than ones attached to e-mails), notes, and other files, on servers maintained and/or owned by the PROVIDER. In my training and experience, evidence of who was using an account may be found in such information.

58. In my training and experience, social media and e-mail providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of login (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, social media and e-mail providers often have records of the IP address used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the SUBJECT ACCOUNTS.

59. In my training and experience, social media and e-mail account users will sometimes communicate directly with the service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Providers of e-mails and social media services typically retain records about such communications, including records of contacts between the user and the provider's support services,

as well records of any actions taken by the provider or user as
a result of the communications.  In my training and experience,
such information may constitute evidence of the crimes under
investigation because the information can be used to identify
the user(s) of the SUBJECT ACCOUNTS.

60.  I know from my training and experience that the
complete contents of an account may be important to establishing
the actual user who has dominion and control of that account at
a given time.  Accounts may be registered in false names or
screen names from anywhere in the world with little to no
verification by the service provider.  They may also be used by
multiple people.  Given the ease with which accounts may be
created under aliases, and the rarity with which law enforcement
has eyewitness testimony about a defendant's use of an account,
investigators often have to rely on circumstantial evidence to
show that an individual was the actual user of a particular
account.  Only by piecing together information contained in the
contents of an account may an investigator establish who the
actual user of an account was.  Often those pieces will come
from a time period before the account was used in the criminal
activity.  Limiting the scope of the search would, in some
instances, prevent the government from identifying the true user
of the account and, in other instances, may not provide a
defendant with sufficient information to identify other users of
the account.  Therefore, the contents of a given account,
including the e-mail addresses or account identifiers and
messages sent to that account, often provides important evidence

29

regarding the actual user's dominion and control of that
account.  For the purpose of searching for content demonstrating
the actual user(s) of the SUBJECT ACCOUNTS, I am requesting a
warrant requiring the PROVIDER to turn over all information
associated with the SUBJECT ACCOUNTS with the date restrictions
included in Attachments B-1 and B-2, respectively, for review by
the search team.

61.  Relatedly, the government must be allowed to determine
whether other individuals had access to the SUBJECT ACCOUNTS.
If the government were constrained to review only a small
subsection of an account, that small subsection might give the
misleading impression that only a single user had access to the
account.

62.  I also know based on my training and experience that
criminals discussing their criminal activity may use slang,
short forms (abbreviated words or phrases such as "lol" to
express "laugh out loud"), or codewords (which require entire
strings or series of conversations to determine their true
meaning) when discussing their crimes.  They can also discuss
aspects of the crime without specifically mentioning the crime
involved.  In the electronic world, it is even possible to use
pictures, images and emoticons (images used to express a concept
or idea such as a happy face inserted into the content of a
message or the manipulation and combination of keys on the
computer keyboard to convey an idea, such as the use of a colon
and parenthesis :) to convey a smile or agreement) to discuss
matters.  "Keyword searches" would not account for any of these

possibilities, so actual review of the contents of an account by
law enforcement personnel with information regarding the
identified criminal activity, subject to the search procedures
set forth in Attachments B-1 and B-2, is necessary to find all
relevant evidence within the account.

63.  This application seeks a warrant to search all
responsive records and information under the control of the
PROVIDER, which is subject to the jurisdiction of this court,
regardless of where the PROVIDER has chosen to store such
information.

64.  As set forth in Attachments B-1 and B-2, I am
requesting a warrant that permits the search team to keep the
original production from the PROVIDER, under seal, until the
investigation is completed and, if a case is brought, that case
is completed through disposition, trial, appeal, or collateral
proceeding.

65.  I make that request because I believe it might be
impossible for a provider to authenticate information taken from
the SUBJECT ACCOUNTS as its business record without the original
production to examine.  Even if the provider kept an original
copy at the time of production (against which it could compare
against the results of the search at the time of trial), the
government cannot compel the provider to keep a copy for the
entire pendency of the investigation and/or case.  If the
original production is destroyed, it may be impossible for the
provider to examine a particular document found by the search

team and confirm that it was a business record of the provider taken from the SUBJECT ACCOUNTS.

66.  I also know from my training and experience that many accounts are purged as part of the ordinary course of business by providers.  For example, if an account is not accessed within a specified time period, it -- and its contents -- may be deleted.  As a consequence, there is a risk that the only record of the contents of an account might be the production that a provider makes to the government, for example, if a defendant is incarcerated and does not (perhaps cannot) access his or her account.  Preserving evidence, therefore, would ensure that the government can satisfy its Brady obligations and give the defendant access to evidence that might be used in his or her defense.

67.  Passwords (and Hashes and Salt): The subscriber will also generally need to use a password that will allow the user to gain access to the account.  Many providers do not store the password directly, rather they use an algorithm (often referred to as a "hashing" algorithm) that is performed on the password and generates a new random of string of numbers and characters, which is what the provider may store.  When a user enters his or her password, the hashing algorithm is performed on the password before it is presented to the provider, and the provider will verify the hash value for the password (rather than the password itself) to authorize access to the account.  As an added security feature, some providers insert additional text before or after the password, which additional text is referred to as

"salting" the password.  The hashing algorithm is then performed on the combined password and salt, which is the hash value that will be recognized by the provider.  Alternatively or in addition to passwords, users may be required to select or propose a security question, and then provide an answer, which can be used to substitute for a password or to retrieve or reset a user's password.

68.  I know based on my training and experience that providers of e-mail or social media services generally have access to and store the web or Internet browsing history of the user while he or she is logged into an account.  That history can include the names and specific websites or URLs/URIs (Uniform Resource Locators or Indicators) of the sites that have been visited.

69.  Providers of similar services will often keep track of what is referred to as user agent string, which contains information about the type of computer, operating system, and web browser used to access the service.  User agent string can include:  web requests or HTTP requests (hypertext transfer protocol is the protocol by which many web pages are transmitted between servers and clients or users); logs containing information such as the requestor's IP address, identity and user ID, date and timestamp, request URL or URI (Uniform Resource Locator or Indicator, i.e., a website address), HTTP protocol version, referrer, and similar information; login tracker logs; account management logs; and any other e-mail or social media accounts accessed by or analytics related to the

33

SUBJECT ACCOUNTS.  These can be used to determine the types of
devices used while accessing the SUBJECT ACCOUNTS, as well as
data related to the user's activity while accessing the SUBJECT
ACCOUNTS.

70.  I have also learned that providers of social media and
e-mail services often track the behavior and activities of
persons using accounts by using cookies, which are strings of
characters and numbers stored on a person's computer on their
web browser.  These cookies can often show whether more than one
account was accessed by the same computer (and specifically the
same web browser), as the provider can recognize that cookie
when the same device returns to the service to access an
account.

71.  In order to identify other accounts used or maintained
by the user of the SUBJECT ACCOUNTS, the warrant also calls for
the PROVIDER to disclose both (1) any cookies associated with
the SUBJECT ACCOUNTS, i.e., those cookies that were placed on
any computers or web browsers (for example, Internet Explorer or
Google Chrome) used to access the SUBJECT ACCOUNTS, and (2) the
identity of any other account in which the same cookie or
cookies used to access the SUBJECT ACCOUNTS was/were recognized.
If in the course of the investigation the digital devices used
by the subject(s) of the investigation are found, they can be
searched to determine if the cookies recognized by the provider
are stored on those devices.  The warrant also calls for the
PROVIDER to identify any other accounts accessed by any computer
or web browser using the same cookies as the SUBJECT ACCOUNT by

providing subscriber records and log-in information for those
other accounts (but not to provide the contents of
communications in those other accounts).

72.   Common Subscriber Record Information:  Users of
accounts are often required to include an e-mail account as well
as a phone number in subscriber records.  The e-mail account may
be an e-mail account hosted at the same provider, or an account
at a different provider.  The e-mail account is referred to by a
number of names, such as a secondary e-mail account, a recovery
e-mail account, or an alternative e-mail account or
communication channel.  That e-mail account is often used when
the identity of the user of the primary account (here, the
SUBJECT ACCOUNTS) needs to be verified, for example if a
password is forgotten, so that the provider can confirm that the
person trying to access the account is the authorized user of
the account.  Similarly, the telephone number used in subscriber
records is often used to send a passcode via text (or "SMS")
that must be presented when trying to gain access to an account,
either in a similar scenario where a user forgot his or her
password, or when users implement what is referred to as "two-
factor authentication" (where the password is one factor, and
the passcode sent via text message to a mobile device is a
second).  In either scenario, the user of a primary e-mail
account (the SUBJECT ACCOUNTS) and a secondary e-mail account or
phone number listed in subscriber records are very often the
same person, or at least are close and trusted and/or working in
concert.  That is because access to either the secondary e-mail

account or to the phone number listed in subscriber records can
allow access to the primary account.

73.  Search History:  In my training and experience,
providers also keep a record of search queries run by the user
of the account, whether searches within the services of the
provider for persons, content, or other accounts (such as if a
user is trying to find the account of an acquaintance), or
broader Internet searches.  In some instances, providers may
also keep records of which websites or contents were "clicked
on" as a result of these searches.  This information is helpful
in the context of the case to show the topics about which the
user was trying to obtain more information or conduct research,
and is relevant for "user attribution" evidence, analogous to
the search for "indicia of occupancy" while executing a search
warrant at a residence.

74.  Providers also frequently obtain information about the
types of devices that are used to access accounts like the
SUBJECT ACCOUNTS.  Those devices can be laptop or desktop
computers, cellular phones, tablet computers, or other devices.
Individual computers or devices are identified by a number of
different means, some of which are assigned to a particular
device by a manufacturer and connected to the "hardware" or the
physical device, some are assigned by a cellular telephone
carrier to a particular account using cellular data or voice
services, and some are actually assigned by the provider to keep
track of the devices using its services.  Those device
identifiers include Android IDs, Advertising IDs, unique

application numbers, hardware models, operating system versions,
unique device identifiers, Global Unique Identifiers or "GUIDs,"
serial numbers, mobile network information, phone numbers,
device serial numbers, Media Access Control ("MAC") addresses,
Electronic Serial Numbers ("ESN"), Mobile Electronic Identity
Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile
Identification Numbers ("MIN"), Subscriber Identity Modules
("SIM"), Mobile Subscriber Integrated Services Digital Network
Numbers ("MSISDN"), International Mobile Subscriber Identifiers
("IMSI"), or International Mobile Equipment Identities ("IMEI").
Apple, one of the primary suppliers of mobile devices used to
access accounts like the SUBJECT ACCOUNTS, had previously used
an identifier that was unique to the hardware of its devices,
such that details of a device's activity obtained from a
particular application or "app" could be used to target
advertisements for the user of that device.  Apple replaced that
hardware-based identifier with the Apple advertiser ID or IDFA
that is still unique to a particular device, but which can be
wiped and re-generated anew by a user if a user chooses to do
so.  Most users, however, do not know that the IDFA exists, and
therefore are unaware that their device's activity can be
correlated across different apps or services.  Google uses a
similar advertiser ID referred to as an AAID.

75.  These device identifiers can then be used (a) to
identify accounts accessed at other providers by that same
device, and (b) to determine whether any physical devices found
in the course of the investigation were the ones used to access

the SUBJECT ACCOUNTS.  The requested warrant therefore asks for the device identifiers, as well as the identity of any other account accessed by a device with the same identifier.

76.  Providers of social media and e-mail often maintain, have access to, and store information related to the location of the users of accounts they service.  That information may be obtained by the provider in a number of ways.  For example, a user may access the provider's services by running an application on the user's phone or mobile device, which application has access to the location information residing on the phone or mobile device, such as Global Positioning System (GPS) information.  It may also be accessible through "check-in" features that some providers offer that allow users to transmit or display their location to their "friends" or "acquaintances" via the provider.

## VII.  **Services Provided and Data Retained by Snap Inc.**

77.  Based on a review of information provided by Snap Inc., the PROVIDER, regarding its services and data retention policies, information provided by other agents, and/or my training and experience, I am aware of the information contained in this section of the affidavit regarding Snapchat.

78.  The PROVIDER owns and operates a free-access social networking mobile application under the name of Snapchat that can be accessed by downloading a Snapchat application onto cellphones.  Snapchat allows its users to establish accounts with Snapchat, and users can then use their accounts to share

messages with each other in written forms, photographs, videos, and other information with other Snapchat users.

79. Snapchat asks users to provide basic contact and personal identifying information to the PROVIDER, either during the registration process or thereafter. This subscriber information may include the user's full name, any alternate names such as a maiden name or nickname, birth date, gender, contact e-mail addresses (including deleted addresses), Snapchat passwords, Snapchat two-factor authentication (for password retrieval and security), telephone numbers, display names, payment information, and other personal identifiers.

80. The following is an overview of how the Snapchat application (or "app") works:

a.  "Snaps" are photos or videos taken using the Snapchat application's camera on an individual's mobile device, and may be shared directly with the user's friends, or in a Story or Chat (both explained below). The PROVIDER's servers are designed to automatically delete a Snap after it has been opened by all intended recipients. The PROVIDER's servers are designed to automatically delete an unopened Snap sent directly to a recipient after 30 days and an unopened Snap in Group Chat after 24 hours.

b.  "Stories": A user can add Snaps to their "Story." A Story is a collection of Snaps displayed in chronological order. Users can manage their privacy settings so that their Story can be viewed by all users of Snapchat, only their friends (individuals with whom the user is directly

connected on Snapchat), or a customized audience.  A user can
also submit their Snaps to Snapchat's crowd-sourced service "Our
Story," which enables the Snaps to be viewed by all
"Snapchatters."  The PROVIDER's servers are designed to
automatically delete a Snap in a user's Story 24 hours after the
user posts the Snap, but the user may delete part or all of the
Story before the 24 hours expire.  Submissions to "Our Story"
may be saved for longer periods of time.

      c.   "Memories" is Snapchat's cloud-storage service.
Users can save their sent or unsent Snaps, posted Stories, and
photos and videos from their phone's photo gallery in Memories.
Content saved in Memories is backed up by Snap and may remain in
Memories until deleted by the user.  Users may encrypt their
content in Memories (called "My Eyes Only"), in which case the
content is not accessible to the PROVIDER and cannot be
decrypted by Snap.

      d.   "Chat":  A user can type messages, send Snaps,
audio notes, and video notes to friends within the Snapchat app
using the "Chat" feature.  The PROVIDER's servers are designed
to automatically delete one-to-one chats once the recipient has
opened the message and both the sender and recipient have left
the chat screen, depending on the user's chat settings.  The
PROVIDER's servers are designed to automatically delete unopened
one-to-one chats in 30 days.  Users can also chat in groups.
Chats sent in groups are deleted after 24 hours whether they are
opened or not.  A user can save a message in Chat by pressing
and holding the message.  The user can "unsave" the message by

pressing and holding it again.  This will delete it from the PROVIDER's servers.  Users can also delete chats that they have sent to a recipient before the recipient has opened the chat or after the recipient has saved the chat.

      e.  "Location Data":  If a user has device-level location services turned on and has opted into location services on Snapchat, the PROVIDER collects location data at various points during the user's use of Snapchat, and retention periods for location data vary depending on the purpose of the collection.  Users have some control over the deletion of their location data in the application settings.

    81.  Snapchat allows users to upload photos and videos, which may include metadata that can indicate, for example, the user's location when s/he captured or uploaded the photo or video, and the date and time the image was captured or uploaded. It also provides users the ability to place a caption on the image and add additional images, sounds, words, and filters to the image to alter the content of the original image.

    82.  Snapchat users can exchange private messages on Snapchat with other users using the Chat function.  These messages are sent to the recipient's "Chat" section on Snapchat, which also stores copies of messages sent by the recipient, as well as other information.  Snapchat users can also post comments on the Snaps (through "Snapback") and Stories.  Such comments are typically associated with the specific Snap or Story to which the commenter is responding.

83.   If a Snapchat user does not want to interact with another user on Snapchat, the first user can "block" the second user from seeing his or her account.

84.   Snapchat has a search function that enables its users to search Snapchat for keywords, usernames, or various activities available on Snapchat, among other things.

85.   Snapchat also has a "Snap Store" feature, which allows users to purchase both tangible and virtual goods.

86.   The PROVIDER has announced that it honors formal requests from law enforcement to preserve information in accordance with 18 U.S.C. § 2703(f).  Upon receiving a signed and dated preservation request on law enforcement department letterhead, the PROVIDER will attempt to preserve available Snapchat account records associated with any properly identified Snapchat user(s) in an offline file for up to 90 days, and will extend the preservation for one additional 90-day period with a formal extension request.

87.   As noted above, on July 7, 2023, I sent the PROVIDER a preservation letter requesting on the government's letterhead that information associated with the SUBJECT ACCOUNTS be preserved for 90 days pursuant to 18 U.S.C. § 2703(f).

88.   As explained herein, information stored in connection with a Snapchat account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and

experience, a Snapchat user's Snaps, Stories, Chats, stored electronic communications, and other data retained by Snapchat can indicate who has used or controlled the Snapchat account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and photos and videos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Snapchat account at a relevant time.

89.  Further, Snapchat account activity, including the Location Data, can show how, when, and where the account was accessed or used.  By determining the physical location associated with the account usage, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Snapchat access, use, and events relating to the crime under investigation.  This geographic and timeline information may tend to either inculpate or exculpate the Snapchat account owner.

90.  Finally, Snapchat account activity may provide relevant insight into the Snapchat account owner's state of mind as it relates to the SUBJECT OFFENSE.  For example, information on the Snapchat account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting

account information in an effort to conceal evidence from law enforcement).

91.   Therefore, the computers of Snapchat are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Snapchat, such as account access information, transaction information, and other account information that are relevant to the investigation into the SUBJECT OFFENSE.

## VIII.   REQUEST FOR NON-DISCLOSURE

92.   Pursuant to 18 U.S.C. § 2705(b), I request that the Court enter an order commanding the PROVIDER not to notify any person, including the subscriber(s) of the SUBJECT ACCOUNTS, of the existence of the warrants until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date the requested warrants are signed by the magistrate judge, or such later date as may be set by the Court upon application for an extension by the United States.  There is reason to believe that such notification will result in: (1) destruction of or tampering with evidence; (2) intimidation of potential witnesses; and (3) otherwise seriously jeopardizing the investigation.  In addition, if the PROVIDER or other person notifies the target of the investigation that a warrant has been issued for the SUBJECT ACCOUNTS, the target might further mask his activity and seriously jeopardize the investigation.

### IX.   CONCLUSION

93.   For the reasons described above, I respectfully submit there is probable cause to believe that the items listed in Attachments B-1 and B-2, which constitute evidence, fruits, and instrumentalities of the SUBJECT OFFENSE will be found in the SUBJECT ACCOUNTS, as described in Attachments A-1 and A-2.


*/s/ Andrew R. Howard*
Special Agent Andrew R. Howard


Attested to by the applicant in
accordance with the requirements of
Fed. R. Crim. P. 4.1 by telephone on
this _____ day of August, 2023.


HONORABLE ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE